IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION



**FILED**

FEB 0 6 2013

Clerk, U.S. District Court
District Of Montana
Missoula

---

SHANE McCLANAHAN,

    Petitioner,

vs.

WARDEN LEROY KIRKEGARD;
ATTORNEY GENERAL OF THE
STATE OF MONTANA,

    Respondents.

Cause Nos. CV 11-092-M-DWM-JCL
CV 11-117-M-DWM-JCL

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE

---

On June 21, 2011, Petitioner Shane McClanahan, a state prisoner proceeding pro se, filed an action for writ of habeas corpus under 28 U.S.C. § 2254. Because his petition contained claims challenging two separate judgments, a second case was opened on September 1, 2011. Both actions are addressed together here.

McClanahan was convicted by a Missoula County jury in 2002 of two counts of attempted deliberate homicide. Although he was convicted of attempt, this case is referred to as "the homicide case." McClanahan was convicted by another Missoula County jury in 2006 of sexual intercourse without consent. This case is

1

referred to as "the rape case." This Court's Cause No. CV 11-92-M corresponds to the homicide case. Cause No. CV 11-117-M corresponds to the rape case.[1]

On June 15, 2012, some of McClanahan's claims were recommended for denial, and Respondent ("the State") was required to file an Answer on three remaining claims:

Claim 1.    McClanahan's statements to Deputies Tillman and Dominick, which were used against him in the homicide case, were obtained in violation of his Fourth and Fifth Amendment rights.

Claim 3.    Trial counsel was ineffective in the homicide case because he failed to call McClanahan's physician to corroborate McClanahan's testimony regarding his injuries.

Claim 5.    McClanahan's right to a speedy trial of the rape charge was violated.

On July 12, 2012, United States District Judge Donald W. Molloy adopted the Findings and Recommendation and denied some of McClanahan's claims. The State filed its Answer on Claims 1, 3, and 5 as well as a motion to dismiss on August 30, 2012. McClanahan was advised that he could file a Reply to the Answer and a response to any motion, *see* Combined Order (doc. 36) at 28 Order ¶ 4, but he did not do so. On January 2, 2013, the Court required McClanahan to supply additional information on his three remaining claims. He responded on January 8, 2013.

---

[1] Unless otherwise noted, citations to the Court's record refer to Cause No. CV 11-92-M.

# I. Analysis of Remaining Claims

The State's motion presents procedural defenses. For the reasons outlined in the Court's previous Findings and Recommendation, however, *see* Combined Order at 4-15, 20-22, it is more efficient to deal with McClanahan's remaining claims on the merits. 28 U.S.C. § 2254(b)(2); *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (making detailed analysis of constitutional issue despite outstanding question as to procedural bar); *Gutierrez v. Griggs*, 695 F.2d 1195, 1198 (9th Cir. 1983).

## A. Claim 1: Violation of Fourth and Fifth Amendments

The homicide case was based on McClanahan's stabbing of two persons during a fight at a party in the Huson/Frenchtown area in the early morning hours of September 9, 2001. McClanahan was charged with two felony counts of attempted deliberate homicide, a violation of Mont. Code Ann. § 45-5-102 (2001), and a misdemeanor count of assault resulting in bodily injury, a violation of Mont. Code Ann. § 45-5-201. At trial, he asserted that he acted in defense of himself and a friend. The jury found McClanahan guilty of both counts of attempted deliberate homicide. He was acquitted of misdemeanor assault.

McClanahan's petition asserted that his arrest was illegal and that statements he made at the time of his arrest were obtained and used against him at trial in violation of his rights under the Fourth and Fifth Amendments. An Answer was

3

ordered because the record before the Court did not "clearly establish that McClanahan had a full and fair opportunity to litigate the legality of his arrest" and did not "clearly establish all the circumstances in which he made statements that were later used against him at trial." Combined Order at 18.

After the Court reviewed the Answer, McClanahan was required to explain whether he had a full and fair opportunity to litigate these claims and, if not, why not. Order Requiring Resp. (doc. 52) at 2. In response, McClanahan stated that "the deputies and the prosecutors" intentionally violated an order in limine excluding his statements. Resp. to Order (doc. 54) at 1. He describes the order in limine as having been entered because the statements were "not relevant and [were] prejudicial to Petitioner's character and defense." *Id.* McClanahan also objected that he "never got the opportunity to argue" against Deputy Tillman, who "claimed I made terrorist threats." *Id.* at 2.

### 1. Arrest (Fourth Amendment)

McClanahan was "arrested out of [his] home," Am. Pet. (doc. 8) at 5 ¶ 15A, that is, *outside* his home, after he exited his house upon request and without constraint, Trial Tr. at 413:25-414:2, 414:7-18, 444:14-16. He spoke with the deputies for a while before he was arrested. *Id.* at 413:25-415:25, 444:10-25; *see also id.* at 506:18-22, 508:12-16.

4

The Fourth Amendment is not violated by a warrantless arrest[2] effected outside

a residence when there is probable cause to believe the arrestee has committed a

felony offense. *United States v. Watson*, 423 U.S. 411, 415 (1976) (discussing

several federal statutes authorizing warrantless arrest based on probable cause, even

without showing of exigent circumstances). The officers went to McClanahan's

home because witnesses at the scene identified him as the person who stabbed Morris

and Knight. They also said McClanahan left in a white Isuzu Trooper. *E.g.*, Trial Tr.

at 412:2-6, 415:19-23, 440:9-24. When McClanahan came out of his house, the

deputies saw he was injured. *Id.* at 443:11-18, 444:3-20, and they noticed the grill

of the Isuzu was "very warm," *id.* at 415:3-7. These facts constituted probable cause

to believe McClanahan was present at the party/fight and knowingly caused serious

bodily injury to two people. Therefore, the arrest did not violate the Fourth

Amendment. Nor, for that matter, did it violate state law, because it was obvious that

important trace evidence could be destroyed absent immediate arrest. *See* Mont.

Code Ann. § 45-5-202 (1999) (defining felony offense of aggravated assault); *id.* §§

46-6-105, -311(1) (authorizing nighttime arrest outside home on probable cause if

immediate arrest is necessary); *State v. Nalder*, 37 P.3d 661, 664 ¶ 14 (Mont. 2001).

---

[2] Dominick said there was an outstanding city warrant for McClanahan's arrest, Trial Tr. at 415:25-416:1, but McClanahan's home was not in the city, Mont. Code Ann. § 46-6-210(1) (1999).

Aside from the lack of merit in this claim, *see Villafuerte v. Lewis*, 75 F.3d 1330, 1342 n.7 (9th Cir. 1996) (per curiam), federal habeas relief is not available where a state prisoner had a full and fair opportunity to litigate Fourth Amendment claims in state court. *Stone v. Powell*, 428 U.S. 465, 494 (1976); *see also* Order Requiring Resp. at 2. McClanahan has not indicated he had anything less. This claim should be denied.

## 2. Statements (Fifth Amendment)

This claim was not recommended for denial on prescreening because, if McClanahan had not had a full and fair opportunity to litigate his Fourth Amendment claim, his Fifth Amendment claim might have been cast in a different light. Following submission of the Answer and McClanahan's response of January 8, it is now possible to address the claim.

### a. What McClanahan Said

Deputies Dominick and Tillman contacted McClanahan at his home sometime after 3:30 a.m., *see* Trial Tr. at 410:12-16, on September 9, 2001. When Dominick asked to speak with McClanahan "about what happened in Huson," McClanahan said "he had been home all night" and "didn't know nothing about Huson." He told Dominick to leave. Trial Tr. at 413:4-10, 414:19-25. When Tillman observed that the grill of the Isuzu was "very warm," McClanahan said he drove into Alberton to

6

get some movies at about 8:00 p.m., "then came right home." Dominick testified that McClanahan continued, "people in Alberton were always trying to get him in trouble and setting him up, but he hadn't been out except to go get some movies at 8:00." *Id.* at 415:3-16.

Tillman testified that McClanahan had an obvious injury to his ankle. Asked how he hurt himself, McClanahan told the officers he had been cutting firewood "most of the day and afternoon" and had fallen, hurting his ankle and bruising or scraping his back. *Id.* at 443:11-444:9.

Tillman also testified that, although McClanahan was "compliant" while he was being arrested, he began "[s]creaming, yelling, *making numerous threats* and intentionally trying to injure himself" after he was arrested and placed in the patrol car. *Id.* at 416:2-7, 445:8-12 (emphasis added).

### b. Circumstances in which Statements Were Made

When the deputies arrived, they told McClanahan they were investigating a stabbing at a house party in Huson and wanted to talk to him. *Id.* at 413:4-6, 414:19-23, 506:18-22. There is no evidence that McClanahan did not voluntarily exit his home to talk to the deputies. Further, although McClanahan was injured, his injuries did not prevent him from mooning the deputies. *Id.* at 414:10-18, 444:14-15.

In his own testimony, McClanahan was asked to explain why he said what he

7

said. He did so, but he did not connect the pain of his injuries with his statements. He told the jury he "didn't want to talk to [the deputies], really," Trial Tr. at 506:17, but he did not say he said so out loud, and the deputies did not say he told them that.[3] He did not say that anyone refused him medical care at all, much less on condition that he make a statement. *Id.* at 488:3-492:12, 505:14-506:22, 508:12-20, 511:13-514:9. On the contrary, he said he did not want medical care. *Id.* at 487:5-23, 512:13-514:9. His brother agreed. *Id.* at 394:12-19, 400:8-10. McClanahan described himself as "groggy" when the deputies arrived at his house, but he was clear-headed enough to make a deliberate decision to lie because he believed all the other people at the party would lie. *Id.* at 488:9-489:10.

After McClanahan was placed in the patrol car, he "alternated between attempting to kick the doors out, break the window glass and intentionally harm himself by slamming his head against the metal in the plexiglass area of the containment screen," spreading "fresh blood all over" the detainee compartment of the police car. *Id.* at 416:3-7, 445:19-446:7; *see also id.* at 489:7-8. He was then taken to the detention center.

---

[3] McClanahan was not entitled to a *Miranda* warning when the deputies arrived to talk to him because he was not in custody at that time. *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966); *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004). He could simply have stayed inside his home if he had chosen to stand on his right not to speak to them. Instead, he came out to talk.

## c. Analysis

Statements obtained by exploiting someone's injuries or by coercion are inadmissible. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). The officers noticed McClanahan's injuries and asked him about them, but the information he gave them indicated he was not in need of immediate medical attention. There is no evidence he requested medical assistance. McClanahan could have been injured several hours earlier in the way he said – cutting firewood – even if the officers believed he was also involved in the stabbing. There is no factual support for the claim that the statements relayed by Dominick and Tillman were obtained by exploitation or coercion.

McClanahan described himself as "throwing a fit" in the back of the patrol car after his arrest and said he "hit [his] head going in and opened up [his] – this front head wound again and it hurt." He also said "there was no leg room[,] . . . I was really hurting," and "I was just stuffed in there," Trial Tr. at 489:4-10. But all the statements that were introduced against him at trial were made before he was placed in the patrol car. Although Deputy Tillman testified that McClanahan was "[s]creaming, yelling, making numerous threats and intentionally trying to injure himself," he did not say what those threats were. Tillman did not use the word

9

"terrorist." In context, Tillman said neither more nor less than McClanahan said – *viz.*, that McClanahan was "throwing a fit."[4] Even under McClanahan's own account, neither his pre-arrest statements nor his post-arrest assertive conduct, if that is what his "fit" was, was obtained in violation of the Fifth Amendment. Further, even if the State "intentionally" violated the order in limine, Tillman's reference to "numerous threats" did not remotely approach the level of violating McClanahan's right to a fair trial.

This claim should be denied.

## B. Claim 3: Ineffective Assistance of Trial Counsel

Claims of ineffective assistance of trial counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). McClanahan must allege facts sufficient to support an inference both that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

Although McClanahan told Deputies Dominick and Tillman that he was injured while cutting firewood, as set forth above, at trial he testified that all of his injuries

---

[4] McClanahan's description of the jury's reaction to Tillman's testimony is patently incredible. If the jury "jerked in th[eir] seats and did a hard double take" at him, as he says, Resp. to Order at 3, it certainly had nothing to do with what Tillman said.

were caused by other people at the party. *Id.* at 476:24-477:2. In the Amended

Petition, McClanahan said:

> My trial attorney did not call a single witness / not even the doctor
> whom casted my leg and witnessed my other injuries and stated I
> suffered a posterior melonomous break to my leg with a blunt / or
> caused by a blunt instrument from behind that matched my open head
> wound trauma.

Am. Pet. (doc. 8) at 3 ¶ C. McClanahan was ordered to state whether, so far as he

knew, trial counsel ever contacted or attempted to contact McClanahan's doctor or

any other medical professional prior to trial. He was also asked whether McClanahan

and trial counsel discussed the medical records and, if so, what was said. Order

Requiring Resp. at 3. In his response, McClanahan explains that he told his lawyer

his doctor said his "injuries were consistent with blunt force trauma inflicted from

behind" and that he had "bruising across my back in the shape of a crowbar." Resp.

to Order (doc. 53) (under seal).[5]

Defense counsel introduced photographs of McClanahan's ankle and the

---

[5] The document was authorized to be filed under seal pending entry of a protective order
pursuant to *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003) (en banc). But what the doctor said
does not fall within the scope of attorney-client confidentiality, and the bare fact that McClanahan
told his attorney what the doctor said does not, under the circumstances here, threaten to prejudice
McClanahan should another proceeding occur. McClanahan's full response to the question
regarding Claim 3 consists of remarks his attorney made to him and is intended to show counsel's
casual attitude to the entire proceeding. As such, it is irrelevant. The response will simply remain
under seal unless McClanahan shows how his attorney's remarks are relevant. If it is necessary to
give the State an opportunity to respond, a protective order should be entered and the State should
be given access to the document.

"bruise and scrape" on his back, Trial Tr. at 432:20-435:2, and the medical records, 490:10-491:8. The jury was also given extensive instruction on the defense of justifiable use of force. *Id.* at 518:18-521:13; *see also id.* at 550:4-555:15. Thus, this is not a case where counsel wholly failed to recognize or support a defense. Assuming, for the sake of argument, that counsel relied solely on what McClanahan told him about the doctor's evidence, the questions are whether it was unreasonable for counsel to fail to interview or call the doctor to testify and whether McClanahan was sufficiently prejudiced to warrant habeas relief.

### 1. Counsel's Performance

There was no real dispute that McClanahan's ankle and back were injured in the fight. As the lead detective said, "the whole crux of the matter is . . . that Shane had obviously been in a fight." Trial Tr. at 432:14-16. It was less clear whether McClanahan received a "front head wound," *id.* at 489:5, or "an injury to his forehead," *id.* at 435:20-23, in the fight. Although McClanahan admitted lying to Dominick and Tillman about how he hurt his ankle and back, he did not say he attempted to explain away a head wound. Neither deputy testified to seeing such a wound or hearing about it from McClanahan. McClanahan's brother Michael testified that, when they both returned to the Isuzu to flee the scene of the fight, McClanahan "said he thought his ankle was broke and his back had been broken

12

somehow or some way," Trial Tr. at 390:1-391:11. Michael did not say he saw a forehead gash or heard McClanahan say anything about it.

On the other hand, defense counsel pointed out that one witness, who did not testify at trial, told police she saw McClanahan "stumbling around after the fight" with "a gash on his head and blood coming down." *Id.* at 438:14-439:6. In addition, one Unsworth, who also did not testify, and possibly other people as well, told police that they kicked McClanahan while he was on the ground. *Id.* at 436:20-438:3. Even Knight, one of the people McClanahan stabbed, admitted he kicked McClanahan, though he said it was after McClanahan stabbed him. *Id.* at 294:13-22. McClanahan had the head wound when he was photographed at the detention center, but of course that was after his "fit" in the patrol car. Trial Tr. at 445:19-446:7; *see also id.* at 489:7-8.

Finally, although McClanahan testified that he thought he was hit with something, he did not say he saw a crowbar or a tire iron. Michael testified that he saw someone with something that could have been a tire iron but did not see one wielded as a weapon. Trial Tr. at 384:10-17. Others testified that the yard was a typical rural Montana yard and there could have been a crowbar or tire iron around, but no one other than Michael actually claimed to see one. None was found at the

13

scene, but then a knife was never found either.[6]

Counsel's decision about the physician was framed by these facts. McClanahan's doctor had nothing to add about the head wound; McClanahan says he spoke only to the back and ankle wounds, about which there was no real dispute. And a physician cannot testify to the particular cause of a particular injury; a physician can only testify that an injury is or is not consistent with information provided by the patient during the examination or by the prosecutor on cross-examination. *Cf.* Trial Tr. at 407:3-408:19. There was not enough benefit to the physician's possible testimony to support an inference either that counsel's failure to interview the physician or his failure to call the physician to testify was a professionally unreasonable course of action.

## 2. Prejudice

The evidence overwhelmingly indicated that McClanahan's back and ankle were injured in the fight, but the jury convicted him of both counts of attempted deliberate homicide anyway. It must have found that McClanahan's response to the fight was unreasonable. After all, he was the only one who used a knife. He gave

---

[6] McClanahan, incidentally, said he did not remember drawing or using his knife or stabbing anyone. Trial Tr. at 482:17-487:2. No one testified that they saw him with a knife before the fight, and no one saw him draw a knife during the fight, though several people testified he had a knife in his hand shortly before or after one or both victims were stabbed. But McClanahan testified that he "must have" drawn his knife, "because it's my knife." *Id.* at 502:8-9.

14

Knight a life-threatening stab wound "4 inches long" that "punctured my lung and cut my lat[7] in half." He inflicted on Morris no less than three major stab wounds, two immediately life-threatening, as well as three or four punctures near the left shoulder blade. Trial Tr. at 269:5-13, 296:17-19; *see also id.* at 403:10-405:23, 468:3-470:24. McClanahan's lawyer probably could have done no harm by interviewing the doctor. But "it couldn't have hurt" does not meet the threshold for showing prejudice. There is no reasonable probability that the jury would have acquitted McClanahan on either of the attempted deliberate homicide charges if only defense counsel had interviewed or called the doctor as a witness.

### C. Claim 5: Speedy Trial[8]

On April 15, 2002, while McClanahan was detained pending trial on the double attempted-homicide charges, he raped his cell mate, who was serving 13 days for his second offense of driving under the influence. McClanahan was charged with one count of sexual intercourse without consent, a violation of Mont. Code Ann. § 45-5-503 (2001). Trial Court Docket (doc. 11-1); Trial Tr. at 79:1-5, 283:7-14; Reply to Mot. to Dismiss (doc. 37-3) at 2-3. Trial on the rape charge commenced on June 27,

---

[7] The trauma surgeon explained, "[T]here was significant laceration of the muscles of the lateral chest wall, along with penetration of the lung cavity." Trial Tr. at 469:16-19.

[8] In this section only, citations to the Court's docket refer to Cause No. CV 11-117-M.

2006, well over four years later. McClanahan alleges this lengthy delay violated his federal constitutional right to a speedy trial.

On prescreening, it was reasonably clear that much delay should be attributed to McClanahan, *e.g.*, Combined Order at 4-15, but an Answer was required because it was possible that other lengthy periods of delay might not be. Combined Order at 27. With its Answer, the State submitted the briefing on McClanahan's motion to dismiss the charges for violation of his right to speedy trial as well as the trial court's ruling. The trial court denied the motion, finding that "[t]o say that the bulk of delay in this matter is attributable to the Defendant is a statement of no little underachievement." Order (doc. 37-4) at 5.

In the trial court, McClanahan's argument for attributing "over 600" days of delay to the State, *id.* ¶ 2, depended on attributing delays in locating counsel for McClanahan to the State. McClanahan's counsel said:

> As for the State's arguments that the defendant is engaged in a "relentless assault" on his appointed attorneys, current counsel would advise the Court . . . that the defendant is not entitled to counsel of his own choosing and the time period it has taken to get him new counsel and to have granted him new counsel when he asked for the same, without doing an analysis of whether he was entitled to new counsel, is institutional delay attributable to the State and not to the defendant. The State could have easily objected to his various requests and advise[d] the Court that he was not entitled to counsel of his own choosing.

Reply to Mot. to Dismiss at 10.

16

In this Court, McClanahan was directed to explain why "all but 110 days of delay" should *not* be attributed to him. Order Requiring Response at 2-3. His response focuses on his attorneys' conduct and, as he contends, misconduct. Resp. to Order (doc. 43-1) at 6-7.

But the United States Supreme Court rejected this line of reasoning in *Vermont v. Brillon*, __ U.S. __, 129 S. Ct. 1283, 1290-93 (2009), a case remarkably similar to this one. While institutional problems in a court's system or practice of appointing counsel might trigger a different analysis, *see, e.g., Boyer v. Louisiana*, No. 11-9953 (U.S. cert. granted Oct. 5, 2012), the only issue with respect to the timing of the rape trial is McClanahan's dissatisfaction with his attorneys. Following *Brillon*, that is not grist for the speedy trial mill. Counsels' delays are attributed to the defendant, whether McClanahan personally agreed to waive his speedy trial right or not. Even assuming that 110 days of delay should be attributed to the State, that length of time is consistent with the "deliberate pace" at which "the ordinary procedures for criminal prosecution are designed to move." *United States v. Ewell*, 383 U.S. 116, 120 (1966), *quoted in Barker v. Wingo*, 407 U.S. 514, 521 n.15 (1972). Consequently, even if McClanahan's trial was not a speedy one, the delays in its commencement did not violate his Sixth Amendment right. This claim should be denied.

McClanahan also asserts that his various lawyers failed to ensure he received

17

a speedy trial, acting instead without his authority in waiving his right and betraying his interests in several other ways. This assertion is a claim of ineffective assistance of counsel. It requires McClanahan to show not only that counsel's performance was deficient, *Strickland*, 466 U.S. at 687-88, but also "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. In reply to the motion to dismiss, McClanahan's counsel asserted that the lapse of time might weaken the recollections of witnesses who heard the victim make statements, before the incident, indicating motive or intent to fabricate. Reply to Mot. to Dismiss at 9-10. But both of those witnesses testified unequivocally to those statements at trial. Trial Tr. at 378:8-381:5, 382:9-383:7 (Henderson), 414:7-415:22, 418:2-19 (Everhart). This claim should be denied.

## II. Counsels' Failures to File Notice of Appeal

In the Combined Order and Findings and Recommendation of June 15, 2012, this Court considered McClanahan's claim that his attorneys failed to file timely notices of appeal in both the homicide case and the rape case. The Montana Supreme Court heard an out-of-time appeal in the homicide case. It denied McClanahan an out-of-time appeal in the rape case, but it heard his petition to entertain one, appointed counsel who then moved to withdraw, "independently examined the record," and concluded that "an appeal in this case would be wholly frivolous."

18

Order at 1, *McClanahan v. State*, No. OP 07-207 (Mont. Sept. 19, 2007) (doc. 35-80). In other words, it gave McClanahan the functional equivalent of an ordinary direct appeal, albeit one in which counsel files an *Anders* brief. Both claims predicated on counsels' failures to file notices of appeal, therefore, were recommended for denial. Combined Order at 22-25.

But the Recommendation section of the document did not include a recommendation to deny the portion of McClanahan's third claim that related to counsels' failures to file notices of appeal. That was an oversight. It is corrected in the Recommendation section below.

### III. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

19

McClanahan's arrest conformed with federal and state law. Each of his statements was voluntary, and he explained each to the jury. Witness statements are frequently contradictory; there is nothing unconstitutional about that. Nor does the Constitution require a defendant to be given witness statements personally or before trial. McClanahan's counsel introduced photographs of McClanahan's injuries and his medical records, so there was no need to call the physician as well. The courses taken by both of McClanahan's direct appeals was hardly consistent with standard state procedure, but in both cases McClanahan eventually received the appellate proceeding to which he was entitled. McClanahan received a speedy trial in the homicide case. Although the delay in his rape case was very long, McClanahan has not shown that it can be attributed to anything other than his own disagreements with his attorneys.

There are no open questions and there is no reason to encourage further proceedings. None of McClanahan's claims has substance. A COA is not warranted.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. McClanahan's first claim should be DENIED as to his arrest and his statements to Deputies Dominick and Tillman;

2. McClanahan's third claim should be DENIED in its entirety;

3. McClanahan's fifth claim should be DENIED as to the rape case, DC-02-176 and CV 11-117-M;

4. All claims in both cases having been denied on the merits, the State's motion to dismiss (doc. 49) should be DISMISSED AS MOOT;

5. McClanahan's petitions in both cases (docs. 8, 1) should be DENIED;

6. The Clerk of Court should be directed to enter by separate document a judgment in each case in favor of Respondents and against Petitioner.

7. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Findings and Recommendation within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing. If either party files objections, it must itemize each factual finding to which objection is made and must identify the evidence in the record relied on to contradict that finding; and it must itemize each recommendation to which objection is made and must set forth the authority relied on to contradict that recommendation. Failure to assert a relevant fact or argument in objection to this Findings and Recommendation may preclude the defaulting party

21

from relying on that fact or argument at a later stage of the proceeding. A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made. The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

McClanahan must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of his case without notice to him.

DATED this 6th day of February, 2013.

Jeremiah C. Lynch
United States Magistrate Judge

22